## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Sean Rafferty, being duly sworn, depose and state as follows:

## AGENT BACKGROUND

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Special Agent with the Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") since December 2002. I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force in Watertown, Massachusetts, along with agents from other federal, state, and local law enforcement agencies, including the U.S. Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), and the Massachusetts State Police ("MSP"). Since becoming a Special Agent with HSI, I have conducted numerous investigations of unlawful drug distribution and importation in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and 963, the laundering of drug proceeds in violation of 18 U.S.C. §§ 1956 and 1957, and have conducted and participated in wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and witnesses and reviewed recorded conversations, telephone, financial records and drug records.

3. In 2003, I graduated from the Federal Law Enforcement Training Center, Criminal Investigator Training Program, and the United States Customs Service Academy, Customs Basic Enforcement School. I have a Bachelor of Science degree in Accounting Information Systems

from Bryant College, Smithfield, RI, and a Master's degree in Criminal Justice from Western New England College. I have attended the DEA Narcotics Investigator training, DEA Telecommunication Training, DEA Highway Interdiction Training, DEA Jetway Interdiction Training, ICE Asset Forfeiture and Financial Investigations Training, and the ICE Conducting Title III Intercepts Training. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. Through my training, education and experience, I have become familiar with the manner in which narcotic proceeds are laundered both domestically and internationally.

4. I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding narcotics trafficking organizations. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement.

## PURPOSE OF AFFIDAVIT

5. I submit this affidavit in support of a Criminal Complaint charging Simrantjit ("SIMRANJIT") Singh and Gursimrat ("GURSIMRAT") Singh with conspiracy to distribute and

to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846 (the "Charged Offense").

6.  I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral reports made to me by agents of HSI and other federal, state, and local law enforcement agencies.

7.  This affidavit is submitted for the limited purpose of establishing probable cause to believe that SIMRANJIT Singh and GURSIMRAT Singh have committed violations of the Charged Offense. Accordingly, I have not included each and every fact known to me and other investigators involved in this investigation. I have set forth only the facts that I believe are needed to establish probable cause.

## PROBABLE CAUSE

*Initial Introduction to UI-1, a/k/a Jay Singh, a California-Based Drug Trafficker*

8.  Beginning in June 2024, a confidential source for the government (hereinafter, "CS-1"),[1] informed investigators that he/she was in contact with an unknown Indian male who was associated with Mexican drug trafficking organizations ("DTOs") operating in California. CS-1 stated that he/she believed this Indian male could provide kilogram quantities of methamphetamine through his connections with the Mexican DTOs. CS-1 first spoke to this Indian male after CS-1, at investigators' direction, informed several individuals connected to the Mexican DTOs that CS-1 wanted to purchase kilograms of methamphetamine. Eventually, those individuals put CS-1 in touch with an Indian male (hereinafter, "UI-1") for the purpose of arranging a drug transaction.

---

[1] CS-1 has been working as a confidential source for HSI since 2018 and has provided information leading to the seizure of kilogram quantities of narcotics. CS-1 is illegally in the United States and is assisting investigators in hopes of receiving immigration benefits. CS-1 has a prior conviction for drug distribution. Information received from CS-1 is believed to be reliable.

3

9. CS-1 began communicating with UI-1 through telephone calls and text messages on WhatsApp at telephone number 559-882-6796 (the "6796 Number"). CS-1 informed agents that UI-1's name in WhatsApp was listed as "Jay Singh." Investigators directed CS-1 to communicate with UI-1 for the purpose of arranging a drug transaction.

10. On June 16, 2024, UI-1 called CS-1 on WhatsApp from the 6796 Number. This call was not recorded. Although these initial WhatsApp calls were not recorded, investigators have reviewed CS-1's call log and confirmed that this WhatsApp call and the WhatsApp calls described below did take place. After the phone call, CS-1 briefed investigators regarding the content of the phone call. During the telephone call, at investigators' prior direction, in lightly coded language, CS-1 told UI-1 that he wanted to purchase multiple kilograms of methamphetamine and have them delivered to Boston, Massachusetts. CS-1 asked UI-1 if he could supply the kilograms. UI-1 informed CS-1 that UI-1's organization could deliver kilogram quantities of methamphetamine to Massachusetts. CS-1 asked UI-1 about the price for the methamphetamine. UI-1 told CS-1 that he would text CS-1 the price.

11. On June 16, 2024, after this phone call described above, CS-1 received a WhatsApp text from the 6796 Number from UI-1 which stated, "$14 bro it's depend on the quantity if you take more Maybe less 50. more bro." CS-1 understood $14 to be $1,400 per pound of methamphetamine. CS-1 also understood the remaining portion of the text message to mean that if CS-1 purchased more methamphetamine, the price would be lower.

12. On June 25, 2024, CS-1 had another phone call with UI-1 over WhatsApp at the 6796 Number. This call was not recorded, but investigators verified the call took place on CS-1's call log. After the phone call, CS-1 briefed investigators regarding the content of the phone call. In lightly coded language, CS-1 told UI-1 that CS-1 had a customer who wanted to purchase 50

4

pounds of methamphetamine and a second customer who wanted to purchase 12 pounds of methamphetamine. CS-1 asked UI-1 to send him the price to have it delivered to Boston. After this phone call, on June 25, 2024, CS-1 received WhatsApp text messages from UI-1 at the 6796 Number. The text messages stated, "50 x 1400 = 70,000", "12 x 1400 = 16,800", "D = 30,000", "Total = 116,800," "He say if you can get 100 or more then 13,500 price brother." CS-1 understood the text message to mean the price was $1,400 per pound of methamphetamine and if CS-1 purchased 100 pounds or more of methamphetamine, then the price would be lowered to $1,350 per pound. CS-1 stated that he believed the 13,500 was a typo for 1,350. CS-1 understood the total for his customer who wanted 50 pounds to be $70,000 dollars and his second customer who wanted 12 pounds of methamphetamine to be $16,800 dollars. CS-1 understood "D =30,000" to mean the cost of delivery and payment for the driver was $30,000 and the total cost for the 62 pounds of methamphetamine and delivery cost was $116,800.

13.     On July 9, 2024, in a WhatsApp text message from the 6796 Number, UI-1 asked CS-1 to download the Threema app to communicate with him. The text message stated, "Brother download Threema app." UI-1 texted CS-1, "What's up not safe brother." CS-1 understood this to mean that UI-1 wanted CS-1 to communicate with him via the Threema App because UI-1 no longer thought WhatsApp was safe for UI-1 and CS-1 to communicate over. Based on experience and training, investigators know that drug traffickers frequently use encrypted messaging applications like WhatsApp, Telegram, Threema, and others, to evade law enforcement detection. Investigators also know that drug traffickers are aware of law enforcement abilities to monitor certain electronic communications, and therefore attempt to transition among different messaging platforms also to evade law enforcement detection.

14.     On July 12, 2024, investigators set up a telephone number for CS-1 to conduct consensually monitored telephone calls and exchange text messages with UI-1 and any other associates. CS-1 then sent a text message to UI-1 and gave UI-1 the new telephone number to call him directly. CS-1 further stated, "You can call me direct just bought a throwaway phone." Later that day, CS-1 received a telephone call from UI-1 using the 6796 Number. This call was recorded. During the telephone call, UI-1 told CS-1 that it was not safe to talk on a regular telephone call. CS-1 told UI-1 that he never had an issue before, and the new phone was "a throw-away phone." UI-1 told CS-1 that they could talk on it one time and CS-1 should then throw the phone away after their conversation. UI-1 told CS-1 that the best thing was the app that UI-1 told CS-1 about (referring to the Threema app from a prior conversation described above). CS-1 explained that he did not want to use his credit card to purchase the app and UI-1 explained that CS-1 could use a $20 gift card to purchase the app. Based on experience and training, investigators believe that UI-1's concerns about speaking over a traditional phone line, the use of Threema, an encrypted messaging app, and his request that CS-1 throw away the phone after using it, were all in an effort to evade law enforcement detection.

15.     During the telephone call, CS-1 asked UI-1 if he could "get it by the 24th," meaning could UI-1 deliver the methamphetamine to Boston by July 24th. UI-1 stated, "Yeah we can send it." CS-1 explained that it was "50 for one guy" and told UI-1 that "the other guy" who wanted "the 12," now wanted an additional five, meaning an additional five pounds of methamphetamine. UI-1 asked CS-1 if the total was now "67," meaning 67 pounds of methamphetamine, and CS-1 confirmed that was the correct total amount. CS-1 also asked UI-1 about getting "samples," meaning smaller quantities of narcotics they had previously discussed and requested the prices. CS-1 had previously asked UI-1 about getting a sample of fentanyl. UI-1 told CS-1 that he would

6

have to come to "Cali," meaning California, to get the sample. UI-1 later told CS-1 that he could come out to California after they conducted this first deal for the methamphetamine. CS-1 asked when the driver was leaving, and UI-1 asked how CS-1 was going to pay. CS-1 explained that he wanted to pay upon delivery. UI-1 explained that he was the middleman, that "it was not his stuff," and that he could not trust a driver with that much money. CS-1 asked UI-1 if they had to do it in California. UI-1 stated, "Yeah," and explained that they could not leave without the money. CS-1 told UI-1 then they had a problem. CS-1 informed UI-1 that he was going to "talk to his people" and would call him back. Based on experience and training, investigators understood UI-1 to be requiring CS-1 to pay him for the methamphetamine in California because UI-1 could not trust the driver with that amount of money ($116,800).

*On July 25-28, 2024, CS-1 and UI-1 Complete Arrangements for a Large Shipment of Methamphetamine to be Delivered from California to Massachusetts.*

16.     On July 25, 2024, in a phone call over WhatsApp from the 6796 Number, UI-1 told CS-1 that they were going to deliver 65 pounds of methamphetamine to CS-1 in Boston, Massachusetts. This call was not recorded, but investigators verified the call took place on CS-1's call log. UI-1 told CS-1 that CS-1 could pay after the deal was complete by either bringing money to California or paying with Bitcoin, a cryptocurrency. CS-1 confirmed that he would pay after the deal and that he still wanted to purchase the 65 pounds of methamphetamine. UI-1 told CS-1 that the shipment was already on its way to Massachusetts. Later that day, at the direction of investigators, over WhatsApp to the 6796 Number, CS-1 texted UI-1, "Tell the driver to hold." At investigators' direction, CS-1 was asking for additional time before the delivery.

17.     On July 26, 2024, over WhatsApp from the 6796 Number, UI-1 texted CS-1, " Boss to [sic] late now he left already[.]" "He got 65 ponds [sic]." "65 x 1400 = 91000 + 30000 = 121000". Based on their training and experience, investigators understood UI-1 to mean that the

7

driver was already enroute from California to Massachusetts with the 65 pounds of methamphetamine. Additionally, UI-1 confirmed the price of $1400 per pound with a $30,000 delivery fee.

18. On July 26, 2024, over WhatsApp using the 6796 Number, CS-1 and UI-1 had a telephone call. CS-1 was not able to record the phone call. After the phone call, CS-1 informed investigators that UI-1 confirmed the driver of the drug shipment would be arriving in Massachusetts on Monday afternoon, July 29, 2024, with 65 pounds of methamphetamine. CS-1 stated that CS-1 and UI-1 again confirmed the total cost of $121,000, which included 65 pounds of methamphetamine at $1400 per pound and a $30,000 delivery charge. UI-1 stated that the driver would contact CS-1 directly to arrange a final meeting time and location.

19. On July 28, 2024, using the 6796 Number over WhatsApp, UI-1 exchanged a series of text messages with CS-1. In one of the text messages, UI-1 sent a series of photos of compressed white powder in kilogram brick form. Two of the pictured bricks contained stamped markings. Based on experience and training, the physical appearance of the bricks, their packaging and markings, investigators believe that these compressed powder bricks are kilogram quantities of narcotics. Investigators further believe that the markings are brand markings drug traffickers frequently use to identify their drug products.

20. Later, on July 28, 2024, at investigators' direction and under their supervision, CS-1 placed a consensually recorded call to UI-1 at the 6796 Number. During that phone call, UI-1 stated, "I sent you pictures with the other stuff to find people who need stuff like that." CS-1 responded, "This is the other stuff that you have?" UI-1 replied, "That's the other one, bricks, you know, coke." CS-1 responded, "You have that too?" UI-1 stated, "Yeah. If someone wants to see or check that's why I sent you pictures to show someone who needs it." Based on their training

8

and experience, investigators believe that UI-1 intended for CS-1 to show the photos of the drugs, believed to be cocaine ("coke"), previously described, to other potential drug customers for the purpose of arranging a future drug deal with UI-1. In the same recorded call, CS-1 provided UI-1 with a new phone number for CS-1. CS-1 told UI-1 to have the driver of the load of methamphetamine contact CS-1 on that new number. Based on my training and experience, it is common for drug traffickers to change phone numbers frequently to avoid law enforcement detection. CS-1 then confirmed the delivery would still take place the following day (July 29, 2024) in the evening. UI-1 explained that they (the driver) had to drop off a regular load of cargo in the morning of July 29, 2024 and then they would be available to meet with CS-1 after dropping off that load. CS-1 again reiterated that UI-1 should pass along CS-1's new phone number to the driver of the shipment and have the driver, and only the driver, contact CS-1 via that new number. CS-1 then told UI-1 that CS-1 would talk to UI-1 later and the call ended.

21. Later, in the evening of July 28, 2024, over WhatsApp using the 6794 Number, UI-1 texted CS-1 asking CS-1 to call UI-1. At approximately 10:32 p.m., CS-1 then called UI-1 at the 6794 Phone. This call was recorded. UI-1 stated, "You didn't tell me how you guys were going to pay." CS-1 stated, "I have a friend of mine that has a business in California that will bring you the money right there. I am going to come to meet you in person to. He is in San Diego." UI-1 confirmed that arrangement was fine and then asked, "Are they going to pay us tomorrow, when?" CS-1 responded, "You got to give me a couple of days if I have to come over there." UI-1 replied, "The driver can't release the stuff without money." UI-1 continued, "The driver is mine, but he has one other person with him. If you are going to pay with bitcoin, that's okay." Because UI-1 was now demanding payment for the drugs on the day of the sale, CS-1 responded, "Let me figure this out. You have me off guard. I thought you didn't want to give the driver anything."

9

UI-1 responded, "It's a lot of money, bro…without the money, he can't release the stuff. They are in New Jersey right now." CS-1 responded, "I have to see the stuff." UI-1 replied, He can make a video if you want to see the stuff." CS-1 asked, "Okay, he has it in the truck?" UI-1 replied, "Yeah." CS-1 stated, "Have him call me tomorrow and we will work something out. You are saying you need the money. You told me you didn't want to give it to the driver." UI-1 reiterated, "Without money, they can't release the stuff." When asked why UI-1 now wanted the driver to pick up the money, UI-1 stated, "Yes, I can trust him because his family members right now. His family is with my friend, his brother, so I know he can do nothing….After that you come anytime to Cali so we can do best business and I can do other stuff and it will be best deal for the stuff in the picture se we can all make good money." Based on experience and training, investigators believe that UI-1 was now demanding payment for the "stuff," or methamphetamine, upon delivery and that the driver was with another man who UI-1 could trust to pick up the money because of their family connections.

*On July 29, 2024, SIMRANJIT Singh and GURISIMRAT Singh Arrived in Massachusetts with 65 Pounds of Suspected Methamphetamine for Sale to CS-1 and Numerous Additional Kilograms of Suspected Cocaine.*

22. On July 29, 2024, at approximately 1:20 p.m., CS-1 had a recorded call with UI-1 over WhatsApp using the 6796 Number. UI-1 stated, "I am calling you to see if you figured out the payment option yet." CS-1 replied, "I am waiting for money to come at three o'clock. You left me off guard." UI-1 stated, "This is the first deal. That's fine… Listen, I have other people that can trust. But they don't trust with his stuff. The other people don't trust us without money." Based on experience and training, investigators believe that UI-1 was reiterating his demand that CS-1 provide the money for the methamphetamine to the driver upon delivery. CS-1 stated, "I am

10

trying to get everything together. Have your driver call me and I will talk to him to set up a time." UI-1 replied, "I can call him and maybe he will call you."

23. On July 29, 2024, at approximately 1:26 p.m., CS-1 received a phone call from phone number 539-316-8000 (the "8000 Number"). The user of the 8000 Number ("UI-2") stated, "This is the guy from California. I got your message. What time are you available for the thing?" CS-1 responded, "Your friend messed everything up for me last night and I am waiting for someone to meet me at 3:00. I will text you after that or call you." UI-2 responded, "Just let me know. I am already there." UI-2 spoke with an Indian accent. CS-1 responded, "Okay, no problem." Based on their training, experience, and the prior communications with UI-1, investigators believe that UI-2 is the trusted person that UI-1 referred to in an earlier conversation with CS-1 as the individual who would be responsible for collecting the money from CS-1 for the methamphetamine shipment.

24. On July 29, 2024, starting at 3:16 p.m., an investigator acting as CS-1, exchanged text messages with UI-2 on the 8000 Number. To initiate the text message exchange, UI-2 stated, "[H]ey bro." The investigator responded, "I am still waiting for the guy to drop off the rest of the $$. I will text you the address in a few. We will do it around 5." The investigator meant that CS-1 was waiting to collect the rest of the money for the payment to UI-2. UI-2 replied, "[H]I bro I just wanna say bcuz my friend told me you by boston right and it takes me 3 to 4 hours to get there so if you want I can leave now so then we can save some time." The investigator responded, "[Y]eah, I thought you were here already."

25. After this text message exchange, on July 29, 2024, at approximately 4:02 p.m., CS-1 received a phone call from UI-2 using the 8000 Number. The call was recorded. UI-2 stated that he had been waiting for the confirmation from CS-1 and that he was going to head to the

11

meeting location at that time. Based on prior communications and the provided time estimate, investigators believe UI-2 was located in New Jersey with the shipment of methamphetamine. UI-2 then asked CS-1 for the address. CS-1 responded that he would send UI-2 the address. After ending this phone call, an investigator acting as CS-1 sent a text message to UI-2 at the 8000 Number stating, "[D]rive towards Methuen." UI-2 responded, "[O]k bro." Based on the timing discussed, investigators believe that the drug transaction would take place the night of July 29, 2024.

26. After this text message exchange, an investigator acting as CS-1 sent a text message to UI-2 at the 8000 Number providing an address in Andover, Massachusetts as the meeting location. Investigators established surveillance in the area of the meeting location. Prior to the planned meeting, investigators met with CS-1 and another confidential source for the government (hereinafter, "CS-2")[2] and searched them for contraband and currency with negative results. CS-1 brought his own vehicle to transport CS-1 and CS-2 to the meeting location. Investigators also searched CS-1's vehicle for contraband and currency with negative results. Investigators equipped CS-1 and CS-2 with recording devices (audio/video for CS-2 and audio only for CS-1). CS-1 and CS-2 then entered their vehicle and investigators surveilled them as they drove to the meeting location. Once CS-1 and CS-2 arrived at the meeting location, investigators maintained surveillance of CS-1 and CS-2 and their vehicle while they waited for UI-2 to arrive in the truck with the methamphetamine.

27. At approximately 10:15 p.m., investigators observed a white tractor trailer with a white trailer, inscribed with the name Jazz Freight Line, Inc., arrive at the meeting location. The

---

[2] CS-2 has been working as a confidential source for HSI since 2018 and has provided information leading to the seizure of kilogram quantities of narcotics. CS-2 is illegally in the United States and is assisting investigators in hopes of receiving immigration benefits. CS-2 has a prior conviction for drug distribution. Information received from CS-2 is believed to be reliable.

tractor trailer parked. Inside the cab of the tractor trailer were two Indian males, a driver and a passenger.

28. CS-1 and CS-2 exited their vehicle and approached the tractor trailer. When both CS's approached the tractor trailer, the driver exited the cab of the tractor. The driver spoke to the CSs and stated that it was "65 pounds," referring to the agreed-upon amount of methamphetamine. The driver then returned to the passenger side of the cab and opened the passenger door. The driver retrieved a small white plastic trash bag out of the cab. As described below, investigators later determined this trash bag contained suspected methamphetamine. The driver handed CS-1 this white trash bag. CS-1 took the bag over to the trunk of his vehicle to inspect it. CS-2 remained by the tractor trailer with the driver. CS-2 and the driver then approach the passenger door of the tractor trailer. The passenger in the tractor trailer cab, handed a CS-2 a large, taped bundle, weighing approximately 30 pounds. CS-2 carried the bundle over the CS-1's vehicle. The driver walked alongside CS-2 to CS-1's vehicle. The passenger then exited the cab of the tractor trailer and carried another large, taped bundle, weighing approximately 30 pounds, over to CS-1's vehicle.

29. After CS-1 inspected the small white trash bag's contents and confirmed it contained suspected methamphetamine, CS-1 indicated to the driver and the passenger that the package looked good. At that point, CS-2 and the passenger each carried a 30-pound bag of suspected methamphetamine to the rear of CS-1's vehicle. The driver also accompanied them. At that point, the CSs told the driver and passenger that they would call their boss to bring the money. The CSs then walked away from their vehicle. While walking away, CS-1 called investigators and let them know the deal was complete. At that point, investigators moved in and took both driver and passenger into custody.

30. Investigators field tested the 65 pounds (approximately 32 kilograms) of suspected methamphetamine, and it tested positive for the presence of methamphetamine. Investigators then searched the cab of the tractor trailer. The driver was identified as SIMRANJIT Singh through fingerprint analysis and self-disclosure during the booking process. The passenger was identified as GURSIMRAT Singh by a California commercial driver's license. Investigators located a cellular phone on SIMRANJIT and multiple additional cellular phones and iPads in the cab of the tractor trailer. GURSIMRAT identified one of the cellular phones as his. Investigators called the 8000 Number in the presence of GURSIMRAT's phone, and the phone rang.

31. Additionally, in the search of the cab, investigators found numerous large cardboard boxes filled with kilogram bricks of compressed powder. Investigators field tested two of the bricks and each tested positive for the presence of cocaine. These boxes of kilogram bricks were all located on SIMRANJIT and GURSIMRAT's beds inside the cab. Overall, investigators counted over 400 individually wrapped kilograms bricks of suspected cocaine. Based on my training and experience, and an average street price in Boston of approximately $25,000 per kilogram of cocaine, the street value of this shipment of cocaine exceeds $10.5 million. A photo of the suspected narcotics found in the cab is below.



## CONCLUSION

32.     Based upon the foregoing, there is probable cause to believe that on or about July 29, 2024, SIMRANJIT Singh and GURSIMRAT Singh did conspire to distribute and to possess

15

with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846.

I declare that the foregoing is true and correct.

                                       *Sean Rafferty /by Paul G. Levenson*
                                       Sean Rafferty
                                       Special Agent
                                       Homeland Security Investigations

Subscribed and sworn to telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on July __30__, 2024.

_____
Honorable Paul G. Levenson
United States Magistrate Judge
District of Massachusetts

16